Louis R. Strubeck, Jr. (SBT 19425600)
Scott P. Drake (SBT 24026812)
Laura L. Smith (SBT 24066039)
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201-7932
Telephone: (214) 855-8000
Facsimile: (214) 855-8200
louis.strubeck@nortonrosefulbright.com
scott.drake@nortonrosefulbright.com
laura.smith@nortonrosefulbright.com

Julie Pettit (SBT 24065971)
THE PETTIT LAW FIRM
2101 Cedar Springs, Suite 1540
Dallas, Texas 75201
Telephone: (214) 329-0151
Facsimile: (214) 329-4076
jpettit@pettitfirm.com

**SPECIAL COUNSEL FOR THE TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 19-31232-sgj7** |
| **WILLIAM BERRY DEAN, III,** | § | |
| | § | **Chapter 7** |
| Debtor. | § | |
| **SCOTT M. SEIDEL, AS CHAPTER 7** | § | |
| **TRUSTEE OF THE BANKRUPTCY** | § | |
| **ESTATE OF WILLIAM BERRY** | § | |
| **DEAN, III,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **vs.** | § | **Adversary No. _____** |
| | § | |
| **WILLIAM BERRY DEAN, III,** | § | |
| **CRAFTSMAN CAPITAL PARTNERS,** | § | |
| **LLC, WILLIAM BERRY DEAN, II and** | § | |
| **AMY ARQUILLA DEAN, AS** | § | |
| **TRUSTEES OF THE WILLIAM B.** | § | |
| **DEAN III IRREVOCABLE TRUST,** | § | |
| **and THE WILLIAM B. DEAN III** | § | |
| **IRREVOCABLE TRUST,** | § | |
| | § | |
| **Defendants.** | § | |

## TRUSTEE'S ORIGINAL COMPLAINT SEEKING TO AVOID AND RECOVER
## FRAUDULENT TRANSFERS

Scott M. Seidel ("Plaintiff" or "Seidel") as the duly appointed Chapter 7 Trustee (the "Trustee") of the estate of William Berry Dean, III (the "Debtor"), files this *Original Complaint Seeking to Avoid and Recover Fraudulent Transfers* (this "Complaint") against the Debtor in the above-captioned bankruptcy case (the "Bankruptcy Case") and the defendants in the above-captioned adversary proceeding (the "Adversary Proceeding"), for declaratory and other relief and respectfully states as follows:

## I.      INTRODUCTION

1. The Debtor has been for years the President of Craftsman Capital Partners, LLC ("CCP"), a private equity group that he co-founded. Prior to and after filing his Chapter 7 Bankruptcy case, the Debtor has diverted his income and transferred substantial assets through CCP to his "trust," the William B. Dean III Irrevocable Trust (the "Trust"), in order to avoid his creditors and continue to fund his extravagant University Park lifestyle. Specifically, the Trust's ownership of 40% of Craftsman Capital Partners, LLC along with the subsequent transfers made by CCP to the Trust based upon this ownership interest and the services provided by the Debtor to CCP are fraudulent transfers that must be avoided. The Debtor cannot be allowed to have his cake and eat it too while his creditors do not even recover crumbs. Accordingly, the Plaintiff Trustee seeks to avoid the fraudulent transfers to the Trust and requests that the Court order turnover of all property in Trust to the Bankruptcy Estate.

## II.      JURISDICTION, VENUE, AND STATUTORY PREDICATE

2. This is an Adversary Proceeding filed pursuant to 11 U.S.C. § 541 and Federal Rule of Bankruptcy Procedure 7001(1) and (9).

3. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), and (O).

4. This court has subject matter jurisdiction under 28 U.S.C. § 1334(b).

5.      Venue of the Adversary Proceeding in this District is proper under 28 U.S.C. § 1409.

6.      This matter arises under the laws of the United States of America. The statutory predicate for the relief sought herein is pursuant to 11 U.S.C. §§ 544(b), 548, and 550.

7.      All conditions precedent to bringing the causes of action asserted herein have been performed, have occurred, or have been waived.

8.      Plaintiff Trustee Scott M. Seidel hereby consents to the Court's entry of a final judgment resolving this adversary proceeding.

### III.      **PARTIES**

9.      Scott M. Seidel was appointed Chapter 7 Trustee in this bankruptcy case.

10.     Defendant William Berry Dean, III is the Chapter 7 Debtor.  Defendant William Berry Dean, III may be served at his residence located at 2829 Daniel Avenue, Dallas, Texas 75205, or wherever he may be found.

11.     Defendant William Berry Dean, II ("Bill Dean"), in his capacity as the co-trustee of the William B. Dean III Irrevocable Trust, may be served at his residence located at 11835 Buffalo Creek Pl., Dallas, Texas 75230-2355, or wherever he may be found.

12.     Defendant Amy Arquilla Dean ("Amy Dean"), in her capacity as the co-trustee of the William B. Dean III Irrevocable Trust, may be served at her residence located at 11835 Buffalo Creek P., Dallas, Texas 75230-2355, or wherever she may be found.

13.     Defendant Craftsman Capital Partners, LLC ("CCP") is a limited liability company formed under the laws of the state of Texas with its principal place of business in Dallas County, Texas. Defendant CCP may be served by serving its registered agent, William S. Walters at 100 Highland Park Village, Ste. 200, Dallas, Texas 75205, or wherever he may be found.

14.     Defendant the William B. Dean III Irrevocable Trust is a trust formed under the laws of the state of Texas and may be served by serving the co-trustees, Amy Dean and Bill Dean, at the address noted above.

## IV.     FACTUAL BACKGROUND

**A.     Debtor's Trust is largely dormant for the first decade of its existence.**

15.     On April 8, 2003, the Debtor's grandmother, as settlor, established the Trust with an initial funding amount of $10,000.

16.     The Trust provided that the Debtor and his father Bill Dean would be co-trustees of the Trust, and that the Debtor, "and his issue, if any," would be its beneficiaries.

17.     The Debtor has identified the Trust as a spendthrift trust.  However, while the Trust contains a spendthrift provision, the Trust also provides that "the Trustees shall pay to or for the benefit of [the Debtor] so much of the net income and principal from this trust as the Trustees, in their sole and absolute discretion, deem necessary or advisable for his education, health, maintenance and support."  Still, "in all matters pertaining to the administration" of the Trust, "the concurrence and joinder of a majority of the Trustees" is required.  Accordingly, any distributions to the Debtor would require the concurrence of both the Debtor and his father, as co-trustees. Debtor claims that he obtained his father's permission, as co-trustee, prior to making any distributions from the Trust.

18.     After the initial funding by the Debtor's grandmother, the next contribution to the Trust wasn't until 2007 or 2008, through an inheritance from the Debtor's grandfather of approximately $200,000 to $250,000.  The Trust then made large distributions to the Debtor, which the Debtor used to purchase (in part) and renovate his prior house on University Boulevard in University Park, Texas.  After these distributions, a small amount of cash was left in the Trust.

19.     Upon information and belief, the only other contribution to the Trust prior to the creation of the Craftsman Entities (discussed below) occurred in early 2014, about the time the Debtor purchased his current house on Daniel Avenue in University Park, Texas, when the Debtor's wife's family contributed approximately $20,000 to the Trust to replace the house's HVAC system.

20.     Accordingly, the Trust was largely inactive between its creation in 2003 and 2014.

**B.      The Total Operating fiasco and subsequent litigation and judgment against Debtor.**

21.     Around 2012, Debtor and his buddy and business partner Jacob Watters seized upon an opportunity to partner with Total Operating, a then-thriving family business that provided ancillary services for the oil and gas industry. Total Operating did everything from mowing right of ways, painting fences, and laying small runs of pipeline. Before the Debtor's involvement, the company was successful, with nearly $8 million a year in revenue and 60 employees.

22.     Debtor and Watters represented to Total Operating's owners that, if they sold a portion of the company to an investment group controlled by the Debtor and Watters, Total Operating would grow as big as the owners could imagine—that they could stop worrying about personal guarantees and access to capital.

23.     Based upon Debtor and Watters's representations, Total Operating's owners agreed to sell 60% of Total Operating to the investment group controlled by the Debtor and Watters. Total Operating's founders also agreed to give the Debtor and Watters the right to appoint three out of the five managers who would comprise the board of managers for the company, thereby giving the Debtor and Watters near full control of Total Operating. After taking control of Total Operating, the Debtor was named as one of its managers and acted as its Chief Financial Officer ("CFO").

24.     Upon assuming his role as CFO, the Debtor took control of Total Operating's credit facility and bank accounts, including a $200,000 savings account about which the Debtor said, "It can't be touched."

25.     Total Operating was soon on the brink of insolvency. Debtor went on a truck-buying binge at a Houston-area car dealership owned by the Debtor's father-in-law.  Not only did Total Operating not need all those vehicles, but it could not even afford to outfit all those vehicles for work in the field.

26.      The ultimate result of allowing the Debtor and Watters to acquire a majority interest in Total Operating was to overburden Total Operating with debt and subject it to management by an investment group that had no experience in the oil and gas industry.

**C.     The Debtor and Watters trick Reticulum into lending Total Operating $500,000.**

27.     By the summer of 2015, the Debtor and Watters were already desperate for cash. Total Operating's financials had "tanked," and the Debtor and Watters were running out of people to convince to give them money.  Total Operating was struggling to pay its vendors and employees, and its continued existence was questionable.

28.     Debtor and Watters induced Reticulum Management, LLC into loaning Total Operating $500,000, to be payable within 90 days.

29.     Debtor and Watters failed to timely repay Reticulum for the $500,000 loan, instead misleading and reassuring Reticulum for as long as possible by producing inaccurate documents showing Total Operating had more liquidity than it truly did.

30.     On June 22, 2016, after learning that, without Reticulum's permission, the Debtor and Watters were selling off seemingly all of Total Operating's assets, which were covered by the Security Agreement, Reticulum filed a lawsuit styled *Reticulum Management, LLC v. Total Operating, LLC*, Cause No. DC-16-07521, in the 14th Judicial District in Dallas County, Texas.

---

31.     On July 30, 2016, in advance of a hearing on Reticulum's application for a temporary injunction, Total Operating filed for bankruptcy relief in Dallas, Texas, under Chapter 7 of the Bankruptcy Code. *See* Case No. 16-70245-hdh.

**D.     The state court lawsuit against the Debtor and Watters and arbitration.**

32.     On May 23, 2017, Reticulum filed a Rule 202 petition in Texas state court against the Debtor and Watters, individually, to investigate claims for, *inter alia*, fraud, fraud by non-disclosure, fraudulent inducement, and negligent misrepresentation relating to the actions of the Debtor and Watters in connection with the Reticulum-Total Operating loan agreements. Watters subsequently filed a motion to stay the state court proceeding and compel arbitration pursuant to an arbitration agreement in the loan documents.

33.     On August 15, 2017, the state court granted Watters's motion and stayed the state court proceeding to allow the parties to proceed to arbitration.

34.     On November 13, 2017, Reticulum filed its demand for arbitration against the Debtor and Watters, which commenced the arbitration proceeding AAA Case No. 01-17- 0006-8709 (the "Arbitration").

35.     On December 3, 2018, the arbitration panel issued its Interim Award, which found Dean and Watters jointly and severally liable for $500,000 in damages, plus attorneys' fees and costs.

36.     With a half-million-dollar final judgment inevitable against him, Debtor scrambled to protect his assets.

**E.     Debtor resigns as co-trustee and files for bankruptcy to escape his creditors.**

37.     In December of 2018, Debtor resigned as co-trustee of the Trust and his mother Amy replaced him.  Amy Dean and Bill Dean are currently co-trustees of the Trust.

38. On January 9, 2019, Debtor filed his voluntary petition under Chapter 7 of the United States Code, thereby initiating Case No. 19-40093. *See* Dkt. 1 filed in Case No. 19-40093. Debtor's filing of his voluntary petition stayed the Arbitration proceeding as it related to him.

39. On March 12, 2019, the arbitration panel issued its Final Award, finding Debtor and Watters jointly and severally liable for $500,000 in damages, plus interest, attorneys' fees, and costs. Reticulum has filed a claim against Debtor.

40. Five additional proofs of claim were filed by various creditors, two of which were filed by the IRS, who claim a grand total of $67,444.84.

**F.    Debtor owns and runs multiple entities through his Trust.**

41. In 2013, around the same time Debtor and Watters took over Total Operating, Debtor and two friends with private equity experience, Will Walters and Paul Thompson, decided to start their own private equity group.

42. In 2014, Debtor, Walters, and Thompson formed Craftsman Capital Partners, LLC ("Craftsman Capital"). When Debtor, Walters, and Thompson formed Craftsman Capital, Debtor's Trust, rather than the Debtor, received a 40% membership interest in Craftsman Capital for a minimal amount (which the Debtor claimed might have been $400). The Debtor is a Manager (which is the governing authority) and President of Craftsman Capital. The act of putting CCP's ownership in the Debtor's Trust, rather than in Debtor's name, was a fraudulent transfer.

43. Since 2014, the Debtor's private equity venture has grown to comprise multiple businesses, with approximately 20 affiliated entities (collectively, the "Craftsman Entities" or the "Craftsman Capital Enterprise").

44. Debtor's roles within the Craftsman Entities, and his investments in and ownership in such entities, are described below.

45. When the Craftsman crew formed CCP Boxx Investment, LLC, Debtor's Trust made an investment to purchase a membership interest in Boxx Investment. Debtor is a Manager of Boxx Investment, which owns 100% of the following Texas entities: (i) CCP Boxx Holdings, LLC; (ii) CCP Boxx, Corp.; and (iii) CCP Boxx Management, Corp.

46. On or around November 18, 2016, Debtor's Trust made an investment to purchase a membership interest in CCP ScanData Investment, LLC. ScanData Investment owns 100% of the following Texas entities: (i) CCP ScanData Holdings, LLC; (ii) CCP ScanData, Corp.; and (iii) CCP ScanData Incentive, Corp. On August 31, 2017, the Debtor, Walters, and Thompson formed CCP ScanData Carry, LLC, a manager-managed LLC, with the Debtor, Walters, and Thompson as its managers.

47. On January 12, 2017, Debtor, Walters, and Thompson formed Cirrascale Cloud Services, LLC ("Cirrascale"), a provider of cloud-based server solutions. The Debtor is a manager of Cirrascale, which was formed as a manager-managed LLC.

48. On October 23, 2018, the Debtor, Walters, and Thompson (through Craftsman Capital or their Trusts or related entities) formed CCP CMIT Investment, LLC ("CMIT Investment"), a manager-managed LLC, in conjunction with Craftsman Capital's acquisition of CMIT Solutions, LLC, an enterprise-level IT managed service provider based in Austin, Texas, and organized under Texas law.

49. Also on October 23, 2018, the Debtor, Walters, and Thompson formed CCP CMIT Management, Corp. ("CMIT Management"), with the Debtor and Walters as its directors.

50. Although Craftsman Capital is a "manager" of CMIT Investment, the Debtor's Trust made an investment to purchase a membership interest in CMIT Investment.

51.     On information and belief, on October 24, 2018, the Debtor, Walters, and Thompson formed CCP CMIT Partnership, LP ("CMIT Partnership," and collectively with CMIT Investment and CMIT Management, the "CMIT Entities"), with CMIT Management as its general partner.

**G.     Debtor has been channeling his income and profits from his businesses through the Trust in an effort to shield his money from his rightful creditors.**

52.     The Debtor's W-2s for 2016 through 2018 reflect that he has received the following income from Craftsman Capital: $5,400 in 2016; $21,600 in 2017; and $36,394.27 in 2018.  Thus, between 2016 and 2018, the Debtor directly received a total of $63,394.27 from Craftsman Capital, ostensibly for his services as its President.

53.     At his Second 341 Meeting, the Debtor estimated that Craftsman Capital receives "anywhere between $20 and $50 thousand . . . per month" in "management fees and distributions from underlying investments that it manages."  Then, after expenses, the Debtor approximates that his Trust receives approximately $60 to $80 thousand a year from Craftsman Capital.

54.     Transfers from CCP to the Debtor's Trust are fraudulent transfers. During 2017 and 2018, the Debtor's SOFA reflects that the Debtor received at least $622,388.23 in "Trust Distributions."  *See* SOFA at 2. These earnings are seemingly comprised of distributions from a series of limited liability companies that Craftsman Capital forms when it decides to invest in various companies.

55.     On information and belief, during that same time period (2016 to 2018), the Debtor funneled through his Trust between $700,000 and $800,000 from certain of the Craftsman Entities, for his benefit.  The Debtor's tax returns for 2016 through 2018 reflect that he had tax liability for pass-through Trust income, the vast majority of which flowed from the Craftsman Entities, as follows: $139,442 in 2016; $299,375 in 2017; and $366,948 in 2018.

---

56.     In sum, while paying himself a minimal, below-market salary, the Debtor ultimately shielded the income generated by the Craftsman Capital Enterprise (which represents more than half of his income) through his Trust, and spent the money as he saw fit to maintain his lifestyle, and to avoid paying Reticulum.

**H.      The Debtor fails to observe formalities or keep adequate records regarding his Trust.**

57.     As mentioned, the Debtor's SOFA reflects that the Debtor received "Trust Distributions" in 2017 and 2018 in the total amount of $622,388.23. *See* SOFA at 2. This amount comprised a multitude of Trust distributions that were used by the Debtor to maintain his "lifestyle," including to pay his credit card bills, as well as to pay his taxes and legal expenses in connection with his dispute with Reticulum. Prior to making such "maintenance distributions," the Debtor claims that he would speak with his father on approximately a monthly basis to discuss the approximate distribution amount the Debtor would need in the upcoming month. The Debtor would then make transfers from his Trust bank account to his personal bank account, or write checks from the Trust bank account, as he thought necessary.

58.     Since the Trust's inception, except for keeping some of the Trust's bank statements, the Debtor failed to maintain any books and records, including cancelled checks or other documents evidencing the purpose of transfers from the Trust. Further, at his 2004 Examination, the Debtor was unable to identify for what specific purpose certain distributions from the Trust were made.

59.     Additionally, Debtor has failed to produce any document evidencing any communications between him and his father, as co-trustees. At his 2004 Examination, the Debtor claimed to have kept no documents or records memorializing any of the communications between the trustees with respect to any aspect of the Trust; he claimed that any such communication would have been by phone.

60.     Further, as discussed above, since at least 2016, while Craftsman Capital has compensated the Debtor with a minimal yearly salary—ranging between $5,400 and a little more than $36,000 (and without any bonuses or benefits)—far below the rate or value commensurate with the services he has provided to (and the revenue generated by) the Craftsman Capital Enterprise, the Debtor has diverted the remainder of what would represent market compensation through his Trust in order to shield such income from the reach of creditors.  At the same time, the Debtor has used his Trust like his personal bank account, in order to maintain his lifestyle and pay for personal expenses and the debts that he wishes to pay—which apparently does not include the payment of his debt to Reticulum.

**I.     Debtor dips into his Trust at will to pay his bills and fund his posh University Park lifestyle.**

61.     Despite his claim of poverty (*i.e.*, filing for Chapter 7 relief), Debtor's lifestyle has been anything but deprived, including a million-dollar home, consistent travel, and an expensive country club membership.

62.     The Debtor resides at 2829 Daniel Avenue, Dallas, Texas 75205 in Highland Park, which has an assessed tax value of $1,032,670.  While the Debtor previously paid his mortgage from his personal bank account, Debtor has since arranged for the Trust to pay his mortgage, presumably from his diverted earnings realized from his association with Craftsman Capital.

63.     Additionally, in the past three years, while he was managing Total Operating to the point of insolvency and then defending himself in state court and arbitration, the Debtor traveled to at least the following destinations: New Orleans, Louisiana (February 2016, February 2017, February 2018); Lisbon, Portugal (April 2016); Buzzards Bay, Massachusetts (August 2016); Puerto Vallarta, Mexico (December 2016); San Diego, California (May 2017); Santa Rosa Beach, Florida (June 2017); Telluride, Colorado (September 2017); Carmel-By-The-Sea,

California (April 2018); and Kiawah Island, South Carolina (July 2018). The Debtor stayed at The Sanctuary at Kiawah Island Golf Resort and the Fairmont Grand Del Mar.

64. Debtor has continued to pay his everyday living expenses with his Trust funds since filing for bankruptcy and making his mother co-trustee in his stead.

65. Weeks before filing his Chapter 7 Bankruptcy petition, in December 2018, on the advice of counsel, the Debtor resigned as a co-trustee of his Trust, and the Debtor's mother Amy replaced the Debtor as co-trustee. Amy Dean and Bill Dean are currently co-trustees of the Trust.

66. Despite Debtor's formal resignation as a co-trustee of the Trust, Debtor's at-will spending and withdrawals from the Trust belie any control or safeguards on the funds in the Trust, as Debtor regularly pays his American Express card with the Trust funds, among other personal expenses.

## V.    <u>CAUSES OF ACTION</u>

### A.    **Count One: 28 U.S.C. § 2201—Declaratory Judgment Against the Trust, Amy Dean, and Bill Dean.**

67. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

68. Pursuant to 28 U.S.C. § 2201, this Court may "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree."

69. Plaintiff Trustee seeks a declaration from the Court regarding the legitimacy of the Debtor's numerous transfers of personal funds to and from his Trust over the past ten years, and whether such transfers were made with the intent to hinder and/or defraud Debtor's rightful creditors.

70.     The Plaintiff Trustee asserts a claim to the Debtor's personal funds in the Trust for the purposes of increasing the assets of the estate to make distributions to the Debtor's creditors.

71.     The Trustee's ability to distribute the funds is dependent upon a determination of the legitimacy of the transferring of the funds under Texas law.

72.     Accordingly, the Trustee seeks a declaratory judgment that:

    a.     The Debtor has fraudulently transferred his personal property into the Trust in order to shield it from Debtor's rightful creditors;

    b.     The property held in the Trust is the personal property of Debtor individually, not property of the Trust, and thus is property of the Chapter 7 Bankruptcy Estate; and

    c.     All property in the Trust must be turned over to the Trustee for distribution to Debtor's creditors.

**B.     Count Two: 28 U.S.C. § 2201—Declaratory Judgment Against CCP**

73.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

74.     Pursuant to 28 U.S.C. § 2201, this Court may "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.   Any such declaration shall have the force and effect of a final judgment or decree."

75.     Plaintiff Trustee seeks a declaration from the Court regarding the legitimacy of Debtor's numerous transfers of personal funds from CCP to the Trust over the past ten years, and whether such transfers were made with the intent to hinder and/or defraud Debtor's rightful creditors.

76. The Plaintiff Trustee asserts a claim to Debtor's personal funds in the Trust that were transferred by CCP for the purposes of increasing the assets of the estate to make distributions to the Debtor's creditors.

77. Accordingly, the Trustee seeks a declaratory judgment that:

    d. The Debtor through CCP has fraudulently transferred the Debtor's personal property into the Trust in order to shield it from Debtor's rightful creditors;

    e. The property transferred to the Trust is the personal property of Debtor individually, not property of the Trust, and thus is property of the Chapter 7 Bankruptcy Estate; and

    f. All property in the Trust must be turned over to the Trustee for distribution to Debtor's creditors.

## C. Count Three: 11 U.S.C. § 548(a)(1)(A)—Avoidance of Fraudulent Transfers Against the Trust, Amy Dean, Bill Dean, and CCP.

78. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

79. Pursuant to 11 U.S.C. § 548(a)(1)(A), Plaintiff Trustee seeks to avoid CCP's transfers of the Debtor's property to the Trust, which transfers were made on or within two years before he filed for bankruptcy.

80. The Debtor through CCP made transfers of the Debtor's property to the Trust with actual intent to hinder, delay, or defraud entities to which the Debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted. The Debtor's actual intent to hinder, delay, and defraud his creditors is evidenced by, *inter alia*, the following:

    a. Debtor continued to retain the possession, benefit, and use of the funds he transferred to the Trust;

    b.        The transfers were to an insider, the Debtor's own trust;

    c.        The Debtor retained possession or control of the amounts transferred because the Debtor and his parents have served as co-trustees of the Trust;

    d.        The Debtor has shielded his income by transferring it to the Trust and refusing to pay his creditors;

    e.        The Trust gave the Debtor no consideration for the many transfers the the Debtor made into the Trust;

    f.        Reticulum had just won the Arbitration against the Debtor prior to the Debtor filing for bankruptcy and beginning his practice of transferring money into the Trust; and

    g.        The general chronology of events and transactions demonstrate the Debtor intended to shield his assets from creditors.

81.      Accordingly, Plaintiff sues to recover the transfers or the value thereof from the Trust and CCP pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550.

**D.    Count Four: 11 U.S.C. § 548(a)(1)(B)—Avoidance of Fraudulent Transfers Against the Trust, Amy Dean, Bill Dean, and CCP.**

82.      Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

83.      Pursuant to 11 U.S.C. § 548(a)(1)(B), Plaintiff Trustee seeks to avoid CCP's transfers of the Debtor's property to the Trust, which transfers were made on or within two years before he filed for bankruptcy.

84.      The Debtor through CCP made transfers of the Debtor's property to the Trust without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (a) the Debtor was insolvent on the date that such transfers were made or became insolvent as a result

of such transfer; or (b). the Debtor was engaged or was about to engage in a business or transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction or intended to incur; or (c) believed that the Debtor would incur debts beyond the Debtor's ability to pay such debts as they became due.

85.     Accordingly, Plaintiff sues to recover the transfers or the value thereof from the Trust and CCP pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550.

**E.     Count Five: 11 U.S.C. § 548(e)(1)—Avoidance of Fraudulent Transfers Against the Trust, Amy Dean, and Bill Dean.**

86.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

87.     Additionally and alternatively, pursuant to 11 U.S.C. § 548(e)(1), in addition to any transfer that Plaintiff Trustee may otherwise avoid, Plaintiff Trustee seeks to avoid the Debtor's transfers of his interests in property that were made on or within 10 years before the date of the filing of the bankruptcy petition, because:

    a.      such transfers were made to a self-settled trust or similar device;

    b.      such transfers were by the Debtor;

    c.      the Debtor is a beneficiary of such trust or similar device; and

    d.      the Debtor made such transfers with actual intent to hinder, delay, or defraud entities to which the Debtor was or became, on or after the date that such transfer was made, indebted.

88.     The Debtor's pattern of depositing his income and other property into the Trust, of which he is a beneficiary, and withdrawing money from the Trust, at will and without requesting permission from his co-trustee or the current co-trustees effectively makes the Trust a "self-settled trust or similar device" under 11 U.S.C. § 548(e)(1).

89. Further, the Debtor made the transfers of his income and assets to his Trust with actual intent to hinder, delay, or defraud entities to which the Debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted. The Debtor's actual intent to hinder, delay and defraud his creditors is evidenced by, *inter alia*, the following:

  a. The Debtor continued to retain the possession, benefit, and use of the funds he transferred to the Trust;

  b. The transfers were to the Debtor's own trust;

  c. The Debtor and his parents have served as co-trustees of the Trust;

  d. The Debtor has shielded his income by transferring it to the Trust and refusing to pay his creditors;

  e. The Trust gave the Debtor no consideration for the many transfers Debtor made into the Trust;

  f. Reticulum had just won the Arbitration against Debtor prior to Debtor filing for bankruptcy and beginning his practice of transferring money into the Trust; and

  g. The general chronology of events and transactions demonstrate the Debtor intended to shield his assets from creditor.

90. Accordingly, Plaintiff Trustee sues to recover the transfers or the value thereof from the Trust pursuant to 11 U.S.C. §§ 548(e) and 550.

**F. Count Six: 11 U.S.C. § 544(b), Tex. Bus. & Com. Code §§ 24.005, 24.008, 26 U.S.C. § 6502(a)—Avoidance of Fraudulent Transfers Against the Trust, Amy Dean, Bill Dean, and CCP.**

91. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

92. Under Section 24.005 of the Texas Business and Commerce Code:

---

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

93.     Additionally and alternatively, pursuant to Texas Business and Commerce Code § 24.001, *et seq.* ("Texas Uniform Fraudulent Transfer Act"), made applicable by 11 U.S.C. § 544(b)(1), the payments or transfers made by the Debtor through CCP to the Trust were made with actual intent to hinder, delay, or defraud the Debtor's creditors.  Alternatively, the transfers were made without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the Debtor was engaged or was about to engage in a business or transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction or intended to incur, or believed that the Debtor would incur debts beyond the Debtor's ability to pay as they became due.

94.     Debtor's actual intent to hinder, delay, or defraud his creditors by transferring funds to his Trust is apparent because:

a.      the transfers were to an insider—the Debtor's Trust;

b.      the Debtor retained possession or control of the property transferred after the transfer;

c.      the transfers have been substantially of all of Debtor's income;

      d.      the value of the consideration received by the Debtor through CCP from the Trust was not reasonably equivalent to the value of the asset transferred;

      e.      the transfers from CCP to the Trust commenced shortly after the Debtor began defrauding Reticulum and throughout the litigation proceedings involving Reticulum, and there was an interim award against Debtor for $500,000 arising from the Reticulum proceedings;

      f.      before certain transfers to the Trust were made, the Debtor had been sued or threatened with suit;

      g.      the Debtor has been claiming insolvency in his Chapter 7 Bankruptcy proceeding after making such transfers and while continuing to make such transfers.

95.     The IRS is a creditor to the Debtor's Bankruptcy Estate.

96.     Plaintiff Trustee hereby sues to recover the payments, transfers, or the value thereof from the Trust pursuant to 11 U.S.C. §§ 544 and 550, Texas Business and Commerce Code §§ 24.005, 24.008, and 26 U.S.C. § 6502(a). To the extent necessary, Plaintiff Trustee relies on his discovery of the transfers pursuant to Texas Business and Commerce Code § 24.010(a)(1).

**G.**     **Count Seven: 11 U.S.C. § 550(a), 26 U.S.C. § 6502(a)—Recovery of Avoided Transfers Against CCP, Amy Dean, Bill Dean, and the Trust.**

97.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

98.     Additionally and alternatively, pursuant to 11 U.S.C. § 550(a), to the extent that the Debtor's transfers through CCP to the Trust are avoided pursuant to Counts One through Six, Plaintiff is entitled to recover the value of said transfers, plus interest, from the Trust and CCP pursuant to 11 U.S.C. § 550(a).

## VI.     **<u>PRAYER</u>**

The Trustee respectfully requests that the Court enter a final judgment:

    A.       Declaring that:

        i.        Debtor has fraudulently transferred his personal property through CCP into the Trust in order to shield it from Debtor's rightful creditors;

        ii.        The property held in the Trust is the personal property of Debtor individually, not property of the Trust, and thus is property of the Chapter 7 Bankruptcy Estate; and

        iii.        All property in the Trust must be turned over to the Trustee for distribution to Debtor's creditors;

    B.       Avoiding the Transfers Made by CCP to the Trust;

    C.       Turning over the Trust assets to the Trustee; and

    D.       Awarding the Trustee such other and further relief as the Court deems just and proper.

Dated: November 5, 2020

Respectfully submitted,

By:/s/ Julie Pettit
Louis R. Strubeck, Jr.
State Bar No. 19425600
louis.strubeck@nortonrosefulbright.com
Scott P. Drake
State Bar No. 24026812
scott.drake@nortonrosefulbright.com
Laura L. Smith
State Bar No. 24066039
laura.smith@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201-7932
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

**-and-**

Julie Pettit
State Bar No. 24065971
THE PETTIT LAW FIRM
2101 Cedar Springs, Suite 1540
Dallas, Texas 75201
Tel. (214) 329-0151
Fax. (214) 329-4076
jpettit@pettitfirm.com

**SPECIAL COUNSEL FOR THE TRUSTEE**